Please proceed. Tell me how to say your last name. I'm not going to mutilate it. Verhoeven. Verhoeven. That's actually how I would have said it. Wow. I should have taken the stab. Okay. Please proceed. Thank you, Your Honor. May it please the Court. There are many issues that we've briefed. I'd like to start by focusing on the simplest issue, and that is there is a complete absence of proof tying Google to the last element of Claim 1, the sole independent claim asserted here. If you win on Claim 1, what happens to, say, damages? It goes away. So damages aren't relevant. We've briefed this under the joint infringement doctrine, Your Honors, but I think it's really helpful to understand the background here. When we were taking discovery, we learned that this step, notifying instantaneous notification to the remote device that the preprocessed data had been received, we ascertained through discovery that SimpleAir was alleging that the transceivers in the accused devices were the entities which SimpleAir alleged was satisfying this element in the software running on those transceivers. It's undisputed that Google has nothing to do with transceivers. It doesn't make transceivers. It didn't select the transceivers. And it doesn't make the code in the transceivers. And so we moved for summary judgment before trial, Your Honors, on this element, and we said we don't have anything to do with it and they can't prove joint infringement. And in response to that, Your Honors, they said, and I quote, and this is at A10602, quote, as for the instantaneously notifying step, SimpleAir does not assert any joint infringement theory. It represented that to the court, Your Honor. Then we proceeded to trial. Our motion was denied. And SimpleAir did not present any theory of joint infringement to the jury. They did what they said they were going to do in discovery. And so, for example, their expert testified, quote, so you agree that the receiver notified the CPU, right? Yes. That's at A2271. Their expert also agreed that the CPU, quote, it has to notify the CPU that the data is there. That's at A2267. And then finally, their expert admitted that the client software operating on these phones, the Android operating system, has nothing to do with that notification step. That's operating system software. And I can provide you that quote as well if you'd like. Why don't you move on to your online-offline argument? Thank you, Your Honor. So our position is that, well, let me back up. The district court addressed our data channel indefinite disargument without guidance from the Nautilus. Correct. That's correct, Your Honor. And we have guidance now, Your Honors. And so here, what we have is a series of continuations. You have the original patent. This is really a poster child for Nautilus. You have the parent patent, the 433 patent. All that patent said- Okay, but this isn't your online-offline argument. This is the one that I asked you to turn to. The claim construction argument? Yes. Okay, I will, Your Honor. Thank you. We had proposed to the court, Your Honor, that the construction for this phrase must distinguish between the data channel and the receiver. Primarily a claim-based argument. So if you look at the last element, claim one, it says that the device must receive notifications through the receiver even when offline from the data channel. It says more than that, but it says that. Well, that means the receiver is different from the data channel, logically. It has to be. At this point, data channel is in reference. When we're calling data channel right now, is that the data field that's noted in the specification? Well, that's the problem, Your Honor. This phrase was added eight years later after the application. The original phrase was just online or offline, period, full stop. And the specification only discloses that. You're either online or you're offline. It's not talking about data channels. It's not talking about online or offline from data channels. So we don't know. But the way that the court construed it was to remove the distinction between the receiver and the data channel, which is the very core of the alleged innovation of this patent, was that you had two physical pipes. If you're one pipe, and I'm using pipes to refer to wireless or wired connections, physical connections, you have two physical connections. And if one of them is offline, you can still get notifications through the other. That's the invention. And what the court did was it erased that invention and said you could have one pipe and data channels referring to some sort of lobby. He didn't define data channels recursive in the construction. He just says data channel. But it's very clear, and he made very clear, and it was clear through the trial, that he meant one pipe, you could have one pipe, which is all there is here, is the receiver, the transceiver, the bones, and the use of data channel was like a logical session instead of a physical pipe. There is nothing in the specification that describes that. And if you look at, for example, the string site cited by Simple Air trying to show where that is, every place they cite is pointing to something other than, there's one place that might be relevant, but every other place is referring to other aspects of the technology here. So they cite the data feeds. Well, data feeds come from the information source to the central broadcast server, have nothing to do with the step we're talking about. They cite registries and subscriptions to receive broadcasts. That has nothing to do with it. They cite at lines 28-31 to the viewer software with logical information categories. Again, nothing to do with this element. The only thing they cite that has anything to do with this is at column 31, 25-31, which refers to, quote, very short notification-centric messages, such as news headlines, dot, dot, dot, are transmitted to the computer, which can then make a, quote, connection 24, that's that line 24 in the figure, can make a connection back to the source 12 to obtain more detailed information. That talks about the physical pipe, that's one of the two pipes, but it does not talk about a data channel. It doesn't talk about online or offline from a data channel. None of that is talked about. Let me ask you, even if we agree with your argument, if the district court clearly erred in its application of the standard of indefiniteness, both in its initial claim construction and then in its denial of your motions, why shouldn't we just send it back to the district court and say, do over?  One is that they already did it over. The same exact judge had the same exact patent, the same exact term, post-nautilus, in another case, and he already said it's not indefinite there, too, right? So why can't we just read that opinion, because it's the same term and the same patent and the same claim. Absolutely. And the same judge, even. Absolutely. Don't we already know exactly what he would say about this term, post-nautilus? I would submit yes, Your Honor. If there's no further questions on data channel. No, I wanted you to focus on online and offline, but I still have trouble getting you there. Oh, I'm sorry. It's been my confusion. Well, what I'm saying is it doesn't show us, the spec doesn't show us what it means to be online or offline from a data channel. I guess I think it does, and the way I think it does, you still win, by the way, so you're not going to lose the argument. But the way I think it does is, I think you don't construe an individual word. A lot of times that is our job. Everybody's focused on an individual word and individual claim. But really, as sort of an old-fashioned patent lawyer, you look at the element. And what the element here is notification, said device, a receipt, a preprocessed data, whether computing devices are online or offline from a data channel associated with each device. So why wouldn't that construction of that phrase, as opposed to the word, just be, are you online or offline from the Internet or some other service like the Internet? Absolutely. Absolutely. That's all the spec supports. Part of what drives me crazy about the indefiniteness argument here is it's so narrowly focused on this one word, which, yes, was added later. But I don't think, if you focus on what the spec discloses over and over again, which is offline, i.e., from the Internet, and then you read this, I don't think, I really have a hard time saying one of the skills in the art would find it indefinite. They'd find it a heck of a lot narrower than Judge Gilstrap did, but they wouldn't find it indefinite. And part of what we're saying and part of what we said to Judge Gilstrap was if you'd reject our construction, then it's indefinite. And we hear that we supposedly waived our indefiniteness arguments. Well, we made it an alternative, and we tried to get this construction. I don't think it's probably a very good idea for us to start going the route of indefiniteness when there is a plausible claim construction that is possibly the one most consistent with the disclosure in the spec that would not render it indefinite. It might arguably render the term data channel in isolation a little bit superfluous because you might have been able to say the same thing without it, right? Just online or offline might have conveyed the same message. Correct. I agree 100 percent. But I don't know that sticking it in there changes how it ought to be described. We're fine if we get the construction we want. There's no dispute that we don't have two pipes and that you wouldn't even need a remand if the correct instruction is put in place. Thank you very much. Can you address very quickly the issue of damages? I'm sorry? Damages. Yes, Your Honor. Is there a question? I'd like to hear your argument, especially with respect to how the court applied, let's say, laser dynamics and the Microsoft settlement. Okay. Absolutely, Your Honor. I'll be a little careful because the numbers are rendered confidential or claimed to be confidential by Microsoft. And you don't have to refer to the numbers at all. Okay. Thank you very much, Your Honor. Let me get there. So we believe that the Microsoft settlement is a laser dynamics situation. Like the laser dynamics case, there are multiple other license agreements that weren't relied on by Mr. Mills, Simple Air's damages expert. In his opinion. Instead, he chose a completely – well, I'll withdraw the completely. He chose an agreement that was on the eve of trial, that was crafted with a competitor, Microsoft, who had no care about whether they allocated portions to the patent about to be tried or not. Their expert was drafting his expert supplemental report based on the Microsoft settlement while the Microsoft settlement was being negotiated. He submitted it two days after it was signed. And this is exactly like laser dynamics. We're on the eve of trial. Microsoft was facing imminent trial. And here's something that's really unusual. In all of their other litigation settlement agreements, there was no allocation. But in this settlement agreement, Microsoft agreed to allocate the vast majority of money – I can't say the numbers – to the 914 patent, even though there were 10 assets subject to the license agreement, as well as general language that included a lot more. This was clearly – Do you have any evidence they were smiling when it was signed? No, Your Honor. But this is clearly a laser dynamics type thing. It's not RescueNet. It's not a bench trial. But importantly, RescueNet had only one license agreement, and they didn't have anywhere else to go. If we were to agree with the court with respect to this issue we're talking about, the use of the money, or let's say if we were to reverse, wouldn't the other alternative theories of damages still provide some sense? That is a very interesting question, Your Honor, and I'm glad you asked that because I'd like to say something about that. There's been a trend because of the development in this court on damages law that damages experts now in East Texas are asserting many, many different theories, and it's clear the reason they're doing that is because then the defendant has to shoot down all of them, and the plaintiff will take the position if there's one left standing, the jury could have relied on it, and therefore the damages verdict still stands. This is a problem, and I have a suggestion for the court on how to solve it, which is we should require in those instances a special verdict form that lists each of the theories, and the jurors should be required to identify it. That would solve that problem, Your Honors. But I don't think we need to reach that today or any damages issues today because it's very clear on the merits. Okay, counsel, we're way behind. Okay. We're almost at the end of all your time. I'll restore some of us rebuttal time. Thank you, Your Honor. Mr. Dovell? Dovell, that's right. Dovell, okay. Let me start by addressing the issue of the data channel construction. The court construed two separate phrases. One was data channel. The other was the online or offline phrase. The only challenge below an indebtedness was to the data channel term, and the only challenge was that, well, there are multiple ordinary meanings and the experts disagree upon it. There was not a challenge that one could not determine what the meaning of data channel was, and, in fact, the other side's expert submitted a declaration in which he said this term does have ordinary meaning. You agree whether or not it's irrelevant that Judge Delstrat applied the wrong standards in analyzing both the motions made by the appellant? The reason I think the standard is relevant is because it didn't play into his analysis. His analysis didn't turn on, well, this barely meets the standard. His analysis was, I can determine what data channel means with certainty. I can identify a construction for it. Both sides say that there are two ordinary meanings, and we need to determine which one is applicable here. He could look at the extrinsic evidence provided by the experts, describing when those two ordinary meanings would apply. He could look at the intrinsic evidence and reach a decision. The decision he reached was not appealed. They don't contend that the right answer was this should have been a data channel, simply a connection to the Internet. They don't assert that. In fact, on appeal, they assert the opposite. They assert that the connection to the Internet is something different than a data channel, and they're right about that. In the context of this patent, a data channel is a connection back to an information source to get a particular category of information, as Judge Delstrat ruled. That resolves the data channel issue. There's no indefiniteness issue that remains. If the court's analysis had turned on the standard, then there would be something to remand. But it didn't turn on the standard. And as a matter of law, because they haven't appealed that data channel construction, that resolves the indefiniteness. Now, they raised… Why isn't the Internet the data channel? Because a data channel is a connection to an information source to provide a category of information. Well, that's the Internet. No, Your Honor. If you just connected to the Internet, you wouldn't be connecting to a channel that would provide a specific subcategory of information. Where do you define that? I don't know where that's defined anywhere in this patent, that a data channel is a subcategory of particular information. Well, the concept of channel is defined in the extrinsic evidence as what a channel means in the context of Internet broadcasting. In addition, Your Honor, in this specification, it identifies data channels, as both experts agree. Where? If we take a look at Column 31… Actually, let's start at Column 7. At the bottom of Column 7, it refers to information sources providing data feeds that include, for example… Information sources such as the Internet, online services, or other information sources provide data feeds, including real-time data feeds. So, why isn't the Internet, just like it says here, an information source? What that phrase is referring to is information sources on the Internet. That's what it's actually referring to. We know that from looking at the other parts of the specification. Information sources such as the Internet. That's what you say. This is Column 7, Line 54. It says, information sources such as the Internet. But what it says there, Your Honor, is information sources 12. And then it says, such as the Internet, online services, and other information sources provide data feeds. It is not an apt phrase. I agree, Your Honor. But it should not… No, but your specification everywhere in here, when you're talking about online or offline, you expressly define it as IE, Column 7, Line 6, offline, IE, not connected to the Internet, or some other online service. Yes, Your Honor. And then down here, when you're talking about information sources, you expressly say an information source is the Internet, an online service, or any other information source that provides data feeds. Boy, that reads a lot like data channel to me. I don't know why we needed to move outside the patent to understand what this means. I don't know why extrinsic evidence could ever be deemed necessary to understand what this means because the patent defines it so clearly. Because, Your Honor, data channel has two meanings to one of ordinary skill. You're approaching it not as one of ordinary skill. You're approaching it as, well, let me just look at the words data and channel and assume I know what they mean. And if we look at the specification, it describes that online or offline refers to a connection to the Internet, as Judge Gilstrap found. And the information sources and the data feeds are also the Internet. Boy, you mean data feed, data channel? Well, no. Boy, that sounds awful similar. And since the spec is supposed to be the number one source of definitional information about what your claim terms mean, I don't know why there's a need for extrinsic evidence here. It doesn't say, Your Honor, that the Internet is a data feed. It says the Internet provides data feeds. But what is a data feed? A data feed is not a connection to the Internet. A data feed is, for example, electronic mail, an electronic mail feed, a premium or special event feed. That's what a data feed is. And we know that because that's what those of ordinary skill who submitted testimony in this case told us. That's what a data feed is. Well, you don't need people with skill in the art to testify. You say it. You define it here. The data feeds generated by the information sources are in digital form and divided into one or more data packets. The data feeds include, but are not limited to, electronic mail, other personal alert notifications, news, sports, financial stories, premium and special feeds, etc., etc., etc. All of this is defined in the patent. I don't know why you need an expert here, much less extrinsic evidence. If Your Honor agrees that a data feed is a data channel, a data feed from an information source, then we are in agreement. But a data feed is not a connection to the Internet. If you're simply connected to the Internet, you're not connected online to a data channel. You're connected online. To be online to a data channel, you have to be connected to a data feed, to a specific information source. For example, in column 31, it explains the way the invention works. We've got information sources providing these data feeds. Then we have a central broadcast server that takes certain information from the data feed. For example, let's take a look at... Actually, let's go back to column 7, where the central broadcaster brought us to it as well. If we take a look, we'll find it, Your Honor. Central broadcaster version, column 8. If you take a look at... Let's start with column 6 of line 37, right at the start of that paragraph. It says, data parsed from a parallel to incoming data feeds. I'm on column 6, line 37 is in the middle of the sentence. Is that where you need me to be? 38, the start of that paragraph. As will be described? Yes. Data parsed from a parallel to incoming data feeds from existing information sources is wirelessly transmitted by the central broadcast server to connected and non-connected computing devices. We're going to parse out some data from the information sources. Then what it says is, if we go to column 31, it says that, starting at line 24, in accordance with the present invention, very short notification-centric messages, such as news headlines and so on, are sent through the central broadcast server. What we're going to do is, we're going to take a headline from a data feed, transmit that to our computing device. Then what does the computing device do? The computer can make a wired connection back to the information source 12 to obtain more detailed information, continuing on in that same column down at line 39. It can go directly to the specific site that the information came from. Then at lines 47 to 49, it establishes connection 24. It takes the user directly back to the location where the information is located. It's connecting the computer to this data feed. As both experts agree, that line 24 is a data channel recited in the claims. I don't know how it could be the data channel. I don't know about the data feed being a data channel, because according to the claim, the data channel has to be associated with each device. I don't think email is associated with any device. I don't think sports and financial services are associated with the device. Yes, they are, Your Honor. The association is you have to have either software or hardware on the device that associates that data channel. For example, in the preferred embodiment, you're installing a special viewer, a special app viewer, that associates a specific data channel. You install the headline news app. You install the sports app. You install the stock quote app. That associates that data channel with the computing device. What are you talking about installing all these apps? These data feeds, according to your specs, are to be accessed through the Internet. So you've got the Internet and the real-time data feeds coming through the Internet. I don't understand where the app is coming in that you're describing. I'm trying to work off your spec. You're saying a lot of stuff, but I'm trying to work it in terms of your spec. Yes, this isn't a specification, Your Honor. There's a large section that deals with what happens on the remote computing device. For example, one thing I can point out is a figure. Because all these data feeds are generated by the information sources, and the information source is the Internet. I kind of thought this just meant you hook up to the Internet and you happen to go to the ESPN. No, Your Honor. It identifies information sources, for example, as CNN, as AOL, as stockquote.com. Yes, but you don't need apps to do those. You can access all of those on live feed directly from the Internet. You can, but then you wouldn't have an associated data channel. Right, but that's what you disclose here is taking those lines. You don't disclose an app. You disclose having these data feeds live through the Internet for other online services. That's not true, Your Honor. There's lengthy passages describing the app. Okay, well, maybe you should take me to that, because I'm just reading the one you directed me to, which is the bottom of Column 7. Don't you agree at the bottom of Column 7, the one I'm reading, says these information sources, the Internet, are going to provide the real-time data feeds? That's just the Internet. It doesn't say anything about an app. An app is not mentioned. Who are you pointing to? The app is on the user site. If you take a look, for example, at Figure 11, this is an example of the user interface that's on the remote computing device. And you'll see these category buttons. Here's a headline, news app, lifestyle, business, sports. What line are you reading? This is on Figure 11. It's at page A185. And if we then look at the specification, for example, at Column 23, starting at line 45, there's a description of the user interface alert panel. And that carries over to Column 24. In fact, most of 22 through 30 is a description of what happens on the remote computing device. These aren't apps. These are not apps. These are simply, it looks to me, and I'm swimming this now, but it looks like this is just a panel which is going to receive notifications from these things. You can click on them and get your notifications. You also can use it to connect back. Stop nodding. When you nod, it's really distracting. Don't do that. Go ahead. You can also use those to connect back to the data channel. It describes using this on the remote computing device side. You can connect back. There's two different ways. There are two different embodiments. One is that the device can be designed such that when a certain type of alert starts, it automatically starts the particular data feed and it links automatically back. The other one is the user can click on it and link back. But all that's done on the app side. But that's simply, Your Honor, simply here. Where? Where? Where does it say it? Because it doesn't say it in this passage. So show me where in the spec what you're claiming now is the disclosed embodiment. This app where you're going to connect back and be. I mean, this passage on column 23 is only about receiving messages and storing them and then you click on these little buttons and you get the messages. Well, Your Honor, for example, at column 35, lines 47 through 48, it says the user can just hit one button. Column 35, this is the claim. I'm sorry, column 31. Column 31, 47 through 48. The user can just hit one button which establishes the connection. 24 takes the user directly to the location where the information is located. Those details, by the way, are not required in the claim. All the claim requires is there be an association between the data channel and the remote computing device. It can be done through software. It can be done through hardware. In the specification, it's done through software. That's how we associate a data channel. We've got a stock quote data channel. Do we have software on the remote computing device? That relates to that stock quote data channel. That's the association of the data channel. That wasn't in dispute below, Your Honor. That wasn't part of the dispute as part of the claim construction. In fact, the phrase associated data channel was not separately construed and there was no dispute among the experts as to what it referred to. There was no dispute at trial about that that was satisfied by the Google system. If there are no further questions about data channel, I can turn briefly to the notifying step where counsel started. I think that our time is up. If you want to just hit it for one minute, you can go ahead and hit it. Thank you, Your Honor. The act of notifying can be performed indirectly. If it's performed indirectly, it's performed using devices, using a series of devices. In this case, the receiver is a device that's used by Google. The receiver is not an entity. It's not a legal entity that performs an act. It's a device. The question is who uses that device. It's not the user that's using it. It's Google that uses it. Google's MCS system sets up a connection that passes through the receiver all the way to the computing device. Google is the entity that initiates the notifying signal. You must have a signal to notify the CPU. It can be the data, and it's Google that initiates that transmission under CERF that would satisfy that element. Thank you, Your Honor. I have a question before you sit down. Is there any evidence in the record that indicates that what appears a natural implication from the terms of the settlement agreement with Microsoft that through its allocation it was specifically designed to harm a business competitor is not correct? I'm not following the question. You're not following? Okay. I don't know whether this is confidential or not. I'm just going to assume it isn't. Google. Is there evidence in the record that refutes that? Well, the evidence would be that Google had a chance to take discovery on that very issue, take the depositions of both Microsoft and Simple Errors negotiators. Google played at trial what they thought was the relevant part from that deposition from Microsoft, and there was no evidence that that was the case, Your Honor. That was an allocation that both parties made that suited both their interests, and the reason is it's important on the Microsoft side of things if they're ever faced with a circumstance where somebody's trying to compare this license to some other technology, that in fact this one particular patent would have a certain amount assigned to it so that they could use that as that's the appropriate comparable. Both sides agreed in that Microsoft negotiation that that was the appropriate amount for that. Below, Your Honor, they didn't assert that that number was wrong. Below, they asserted, they agreed that was the amount that should be assigned to the 914 patent. There's no dispute about that. They affirmatively asserted that in their motion papers, and their expert agreed that that was the appropriate amount to sign to the 914 patent. Finally, Your Honor, at best, this becomes an issue for cross-examination. It's a challenge to a piece of data that was used by the expert in making one adjustment for this comparable, and the court's precedent, including active video and others, hold that such adjustments are simply matters for cross-examination. They don't give rise to a dogged challenge, Your Honor. It would simply be a situation you have to raise on cross-examination. It wouldn't be something that would be a reason for excluding the entire testimony because the methodology is correct. We're taking a comparable. We're making appropriate adjustments and the appropriate types of adjustments. The challenge to the data used in the adjustment is not a proper dogged challenge. Thank you. Very briefly, Judge Wallach, to answer your question, the settlement agreement was entered into weeks before trial. There was not enough time or opportunity to adequately explore it. And as to the notion that our expert agreed, we lost the Dauberg motion, Your Honor. And so the Microsoft agreement was in evidence. And so we had to deal with, at trial, the ruling on Dauberg. It doesn't mean we agreed with it. We expressly challenged it. On the issue of where in the spec there's descriptions of this construction of data channel, I think that we can see that, for example, in Column 7, they're not even talking about the notification or any connection to the remote computing device. They're pointing to the connection between the information source and the central broadcast server. That's what that column is talking about. Same thing with Column 6. It's talking about the data feed connection to the CBF. It's not talking about any connection. It has nothing to do with that connection. And when you look at Column 31, which they point to, it's talking about a wired connection back to the information source. And it's specifically talking about the pipe. It's a wired connection back, which is totally consistent with the construction, Your Honors, we're intimating at, that online or offline period is what the specification is talking about. And secondly on this site, this is not part of the claimed elements either. The claimed elements don't, the spec talks about you can go back then after you get your notification and use 24, line 24, physical pipe. But that's not part of the claim language. The claim language is if you're offline from line 24, there's another way to get that notification through the paging service. On the other side, if you look at the Figure 1 in this patent. So, unless Your Honors have any questions about the comments that were made on the joint infringement or notification stuff, I think that addresses my rebuttal. No, I thank both counsels for their arguments and cases taken under submission. Our final...